AMENDED OPINION
ALAN E. NORRIS, Circuit Judge.
Petitioner Lewis Gagne and his co-defendant, Donald Swathwood, were each charged with three counts of criminal sexual misconduct for forcibly and simultaneously engaging in sexual activities with Gagne’s ex-girlfriend, Pamela Clark. All of the charges arose out of events occurring over the course of one night. The key question at trial was one of consent. The jury convicted Gagne of two counts, and Swathwood of three. Gagne filed a petition for a writ of habeas corpus, 28 U.S.C. § 2254, and the district court granted him relief on the basis that the state trial court’s decision to exclude certain evidence had violated Gagne’s due process right to present a meaningful defense. Respondent, Warden Raymond Booker, represented by the Michigan Attorney General (“the State”), appealed. We now affirm.
I.
A.
Gagne and Swathwood were each charged with three counts of first-degree criminal sexual conduct. Mich. Comp. Laws § 750.520b(l)(f).[1] Gagne’s three *280 charges included two counts of forcible penis to mouth penetration and one count of forcible penis to vagina penetration, charges for which consent is a full defense. See People v. Waltonen, 272 Mich.App. 678, 728 N.W.2d 881, 887 (2006), appeal denied, 478 Mich. 866, 731 N.W.2d 718 (2007); see also People v. Hearn, 100 Mich.App. 749, 300 N.W.2d 396, 398 (1980). A jury convicted Gagne of forcible vaginal penetration and of one count of forcible oral penetration.
The parties do not dispute the background facts that set the stage for what occurred on the night of July 3, 2000. The complainant, Clark, and Gagne dated from some time in January until early June of that year. Gagne moved in with Clark in late January or early February, and the two lived together until them relationship ended. Throughout this time, Clark worked, but Gagne did not, and Gagne would frequently use her work phone and her personal ATM card, sometimes without her knowledge.
Also undisputed were the events that took place around midnight on July 3, 2000. After spending most of that day doing yardwork, during which time she consumed most of a pint of vodka, Clark retired to her house to watch television. Gagne arrived uninvited at about 10:45 p.m. He informed Clark that he and his friend Swathwood, whom Clark also knew, were going to move to California. Shortly thereafter Swathwood and a third man, Michael Stout, arrived. The group began drinking beer and possibly smoking marijuana. By Clark’s own estimate she consumed nine or ten beers during this time.
This point in the story marks the beginning of the facts contested at trial. We begin with the version urged by the prosecution, which was presented almost entirely through Clark’s testimony. At some point after midnight, Clark and Gagne took a shower together. Afterwards, Clark, who believed that Swathwood and Stout had left, participated in oral sex with Gagne in the living room. Swathwood entered the room and began engaging in intercourse with her while Gagne forcibly held her head down. A few minutes later, Gagne released Clark and the two went into the bedroom where Clark told Gagne she did not want to have sex with Swath-wood. Clark then began performing oral sex with Gagne. Swathwood again entered the room and began engaging in intercourse with her. The men held Clark down, and each had intercourse and oral sex with her, at various points slapping her buttocks and using sexual devices that Clark kept in her room.
At approximately five a.m. the men tired of this activity and left the room. Clark went into the bathroom, vomited, took a shower, and returned to bed where she slept until approximately noon the next day. At that time she discovered her ATM card was missing, and upon further investigation learned that at 5:28 that morning someone had withdrawn $300 from her account, and had tried to withdraw more money twice in the following fifteen minutes.
The defense’s version of events differed primarily on the issue of consent. According to Gagne and Swathwood, the group purchased and smoked some crack cocaine at around midnight. Clark then began talking with the men about engaging in group sex, and in large part instigated the group sexual activity, first in the living room and then later in the bedroom. *281 Their description of the sexual activities differed only in that Clark consented to them. They concede for instance, that they spanked Clark. At about five a.m. Gagne and Clark agreed that Gagne should leave and purchase more crack with money withdrawn using her ATM card. All three men left in Clark’s car. Gagne dropped Stout off at home, withdrew $300 from an ATM using Clark’s card, and then drove to a street corner and purchased crack. The defendants became nervous when they saw police cars in the area, so instead of returning home, they drove to a cemetery and smoked the crack. The defendants testified that they returned to Clark’s house later that morning and Gagne returned her ATM card. Clark was angry and told Gagne to leave, so he did.
Clark testified that, two days later, she told her adult son that she had been raped. She also told the police, and saw several doctors. The doctors noted that she had some bruising but no trauma to her wrists or shoulders, which are typically present after a sexual assault. Nor did any of the doctors find any internal or external tears to Clark’s vagina or rectum.
B.
As noted above, at the heart of Gagne’s petition for habeas corpus is the trial judge’s exclusion of certain evidence from the trial. As required by the Michigan rape shield law, Mich. Comp. Laws § 750.520j(l) & (2),[2] Gagne filed a motion in limine seeking to introduce evidence regarding several aspects of Clark’s prior sexual experiences and tastes. The trial judge denied the motion in part, excluding evidence regarding two subjects that are relevant here: an incident of group sexual activity involving Gagne, Clark, and a man named Ruben Bermudez; and Clark’s solicitation of Gagne’s father to join her and Gagne in group sex. The court’s exclusion of this evidence gives rise to this appeal.
The court also granted Gagne’s motion in part, and, because it is especially relevant to our analysis, we recount in some detail the evidence the court decided to admit regarding sexual activity that occurred one night involving Gagne, Swath-wood, Clark, and two other females they met at a bar called Tony’s Lounge (“the Tony’s Lounge incident”). In the spring of 2000, Clark, Swathwood, and Gagne went to Tony’s Lounge, where they drank for some time. At the bar Swathwood met two women. All five of them departed together and went to a house belonging to one of the women. There were people at the house when they arrived. Clark and Gagne began to engage in some sort of “sexual behavior” in the living room while Swathwood had intercourse nearby with the other two women. Clark testified that she did not “engage in sex of whatever kind with Donny Swathwood” while they were in the living room. When someone knocked at the door, Clark and Gagne relocated to the bedroom where they began alternately having intercourse and arguing. Swathwood brought the other women into the bedroom. Gagne and *282 Clark’s argument escalated, and finally Clark left and went home.
Clark was extremely intoxicated during these events; she testified that she drove home that night but did not remember doing so. The next day, Gagne informed her that there was more from the previous night that she did not remember, including that she had engaged in oral sex with Swathwood. Clark testified that she had no memory of this. Nonetheless, she believed Gagne and told others what had happened with Swathwood, including Swathwood’s girlfriend at the time.
Finally, Clark testified that, at some later date, she and Gagne “were talking about being with other men or being with other women” sexually, and discussed the Tony’s Lounge incident:
And I told him that, you know, I honestly have not been with any other man except, what you told me about [Swath-wood] and I don’t remember that. And he said to me, I was just lying ’cause I wanted to go to bed with the same — the girl that [Swathwood] was having sex with. And I — and then he told me that he did have sex with her that night. And she — the girl had told me something different.
For his part, Swathwood testified that Clark engaged in oral sex with him that night in the presence of Gagne and the other two women. Swathwood answered “yes” when asked, “Fair assessment to say this was kind of a group-sex, orgy-type situation?”
In her closing argument, the prosecutor repeatedly emphasized the unlikeliness of the defendants’ version of the story, which, in her words, was “more consistent with the pornographic movie than real life.” The defense responded by attacking Clark’s credibility and arguing that she had consented by pointing to the Tony’s Lounge incident as evidence of this theory. During rebuttal, the prosecution argued to the jury, that, insofar as the Tony’s Lounge incident was concerned, “Even if you believe, contrary to ... what Ms. Clark told you, that she did engage in consen[s]ual sexual contact with Mr. Swathwood, the nature of the contact and relations here were 190 degrees [sic] different. That situation did not involve, ladies and gentlemen, two men.”
On direct appeal, Gagne raised a number of claims, only one of which is relevant here: that the trial court violated his due process right to present a defense when it excluded the evidence regarding the group sexual activity with Bermudez, and Clark’s solicitation of Gagne’s father to participate in group sex with her and Gagne.
The state appellate court acknowledged that rape shield statutes can occasionally abridge a defendant’s constitutional rights, but concluded that the evidence of the group sexual activity with Bermudez and the invitation to Gagne’s father were irrelevant because they involved third parties, not Swathwood. People v. Swathwood, Nos. 235540 and 235541, 2003 WL 1880143, at *1-2 (Mich.Ct.App. Apr.15, 2003). Additionally, the Bermudez incident was said to be even less relevant because it had occurred while Clark and Gagne were dating; by July 3, the couple had been separated for three weeks. Id. at *2. The court of appeals also determined that Gagne’s constitutional rights were not violated because he was allowed to present evidence regarding the Tony’s Lounge incident, which the court felt sufficiently demonstrated that Clark “was not averse to group sexual activity.” Id. at *3.
The court of appeals affirmed Gagne and Swathwood’s convictions and remanded for sentencing determinations that are irrelevant to this appeal. The state court proceedings ended when the Michigan Su *283 preme Court denied Gagne leave to appeal.[3] People v. Gagne, 469 Mich. 982, 673 N.W.2d 755 (2003) (unpublished table decision).
Gagne filed a pro se petition for a writ of habeas corpus, asserting four claims. The district court granted relief on the due process claim arising from the trial court’s exclusion of evidence. The court determined that relief was warranted because the excluded evidence was highly relevant since it involved occurrences remarkable in their similarity to the events on the night of July 3. This evidence was crucial to the defense because this case was essentially a “credibility contest” between Clark on the one hand, and Gagne and Swathwood on the other. The court granted Gagne a conditional writ of habeas corpus, and the State timely appealed.
II.
We review a district court’s decision to grant habeas relief de novo. Hereford v. Warren, 536 F.3d 523, 527 (6th Cir.2008). Because Gagne filed his habeas petition after the enactment of the Anti-Terrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, we review the last reasoned state court decision on the issue to determine whether that decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or “was based on an unreasonable determination of the facts.” 28 U.S.C. § 2254(d). A state court’s determination is contrary to clearly established federal law if “the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.” Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state-court decision is an unreasonable application of clearly established federal law “if the state court identifies the correct governing legal principle from [the Supreme Court’s] decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Id. at 413, 120 S.Ct. 1495.
III.
The Supreme Court has repeatedly recognized that the right to present a complete defense in a criminal proceeding is one of the foundational principles of our adversarial truth-finding process: “Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants ‘a meaningful opportunity to present a complete defense.’ ” Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)) (internal quotation marks omitted). But a “meaningful opportunity” is not “every opportunity,” and relevant evidence is frequently excluded from trial. Trial judges must make “dozens, sometimes hundreds” of evidentiary decisions throughout the course *284 of a typical case, and rarely are these of constitutional significance: “the Constitution leaves to the judges who must make these decisions ‘wide latitude’ to exclude evidence that is ‘repetitive ..., only marginally relevant’ or poses an undue risk of ‘harassment, prejudice, [or] confusion of the issues.’ ” Crane, 476 U.S. at 689-90, 106 S.Ct. 2142 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (alterations and omissions in original). But while the Constitution leaves much in the hands of the trial judge, “an essential component of procedural fairness is an opportunity to be heard.” Id. at 690, 106 S.Ct. 2142.
The Supreme Court in Crane made clear that whether a defendant has a constitutional right to present evidence turns on the extent to which that evidence is so “highly relevant” that it becomes “indispensable” to the success of the defense. 476 U.S. at 691, 106 S.Ct. 2142. In that case, the trial court excluded evidence of the circumstances surrounding the defendant’s confession, which the defense argued would have cast doubt on the credibility of that confession. Id. at 684-86, 106 S.Ct. 2142. The Supreme Court, in determining that this exclusion violated the defendant’s right to present a meaningful defense, explained that the “opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant’s claim of innocence.” Id. at 690, 106 S.Ct. 2142. The evidence, which related to the physical circumstances of the confession, was so “highly relevant to [the] reliability and credibility” of the confession, and the confession was so integral to the defense, that the excluded evidence was “all but indispensable to any chance of [that defense] succeeding.” Id. at 691, 106 S.Ct. 2142.
In Crane, the Court’s inquiry did not end with consideration of the defendant’s interests. Rather, the Court sought to balance those interests against the state’s interests in the evidentiary exclusion at issue; simplifying the Court’s task was the fact that the state did not attempt to come forward with a justification for the questioned exclusion. Crane, 476 U.S. at 691, 106 S.Ct. 2142.
Thus, Crane makes clear that a proper inquiry into the constitutionality of a court’s decision to exclude evidence begins with considering the relevancy and cumulative nature of the excluded evidence, and the extent to which it was “central” or “indispensable” to the defense. Against this courts must balance the state’s interests in enforcing the evidentiary rule on which the exclusion was based, in this case Michigan’s rape shield statute.
When applying this delicate balance to the Michigan rape shield statute, we do not write on a blank slate. The Supreme Court has already considered that statute and, in doing so, reiterated these competing considerations. Michigan v. Lucas, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991). In that case, the Court reviewed a holding of the Michigan Court of Appeals that the rape shield statute’s “notice-and-hearing requirement is unconstitutional in all cases where it is used to preclude evidence of past sexual conduct between a rape victim and a criminal defendant.” Id. at 148, 111 S.Ct. 1743. Among other provisions, the statute requires the accused to file “a written motion and offer of proof’ within ten days of his arraignment if he plans to introduce evidence of the victim’s past sexual conduct. Mich. Comp. Laws § 750.20j(2). In Lucas, the defendant failed to file the motion in a timely manner and the trial court excluded the evidence on that basis. The Supreme Court recognized that “the [rape shield] *285 statute unquestionably implicates the Sixth Amendment” but also noted that placing limits on the ability to present a defense “does not necessarily render the statute unconstitutional.” Lucas, 500 U.S. at 149, 111 S.Ct. 1743. Quoting the same passage from Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431, that it relied upon in Crane, supra, the Court recognized the wide latitude enjoyed by trial judges to limit the introduction of evidence. Id. In the Court’s view, the Michigan rape shield law “represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy.” Id. at 150, 111 S.Ct. 1743. Given these competing considerations, the Court framed the question posed to it as follows: “[Wjhether the legitimate interests served by a notice requirement can ever justify precluding evidence of a prior sexual relationship between a rape victim and a criminal defendant.” Id. at 151, 111 S.Ct. 1743.
The Court answered in the affirmative and reversed the per se rule of the Michigan Court of Appeals. Id. at 152-53, 111 S.Ct. 1743. Significantly in our view, it did not hold that preclusion of evidence for failure to comply with a notice provision is always appropriate. As in all of its cases balancing evidentiary considerations with the right to present a complete defense, the Court made clear that a case by case evaluation is required. Accordingly, it remanded for the Michigan courts to perform such a balancing and, in doing so, the Court “expressed] no opinion as to whether or not preclusion was justified in this case.” Id. at 153, 111 S.Ct. 1743.
IV.
With these precepts in mind, we turn to the facts before us. The writ may issue only when petitioner is “in custody in violation of the Constitution or laws or treaties of the United States.” 28 U.S.C. § 2241(c)(3). And, as we stressed earlier in this opinion, our task is not to reach our own independent conclusion regarding the constitutional validity of the evidentiary decision to exclude evidence; rather, we must determine if the last reasoned state court opinion was either contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).[4]
The Michigan Court of Appeals affirmed the trial court’s judgment. It acknowledged that evidentiary laws, including rape shield statutes, must give way when constitutional rights of the accused, specifically the Sixth Amendment right to confrontation, are implicated. People v. Swathwood, 2003 WL 1880143, at *1 (citing People v. Hackett, 421 Mich. 338, 365 N.W.2d 120, 124 (1984) (“in certain limited situations, such evidence [of prior sexual conduct] may not only be relevant, but its admission may be required to preserve a defendant’s constitutional right to confrontation”)). Balanced against these constitutional considerations, the court of appeals observed that the Michigan Supreme Court has instructed trial courts to be “mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant’s sexual conduct where its exclusion would not unconstitutionally abridge the defendant’s right to confrontation.” Id. (quoting People v. Adair, 452 Mich. 473, 550 N.W.2d 505, 511 (1996) (quoting Hackett, 365 N.W.2d at 125)) (quotation marks omitted). The balance struck by the court *286 of appeals in this case is entirely consistent with the approach taken by the United States Supreme Court in Lucas. While the Michigan Court of Appeals did not cite federal constitutional law in its decision, its rendition of the appropriate legal analysis was not “contrary to” the “clearly established” federal law reflected in either Crane or Lucas.
That being the case, the writ may issue only if the court of appeals unreasonably applied that law. 28 U.S.C. § 2254(d)(1). We conclude that it did. With respect to the evidence regarding a “threesome” that included petitioner, Clark, and Bermudez, it reasoned as follows:
[T]he complainant’s willing participation in a threesome with Gagne and Bermudez is not probative of whether she consented to a threesome with Gagne and Swathwood on the night of the alleged offense. Notably, the threesome involving Bermudez occurred while the complainant and Gagne were still dating. The instant offense occurred after they had ended their relationship, and it involved Swathwood, not Bermudez. In light of the lack of similarity between the Bermudez threesome and the instant offense, we conclude that the trial court did not abuse its discretion in excluding the evidence.
Swathwood, at *2. The court of appeals also observed that the jury heard at length about the group sexual activity that followed the visit to Tony’s Lounge, which included Clark and multiple partners. Id. at *3. Thus, “defendants presented evidence that the complainant was not averse to group sexual activity” and “the trial court did not abuse its discretion in excluding the evidence.” Id. at *2-3. The court employed similar reasoning before reaching the same conclusion with respect to the invitation to Gagne’s father to join in group sex. Id. at *3.
In our view, the court of appeals underestimated the vital nature of the disputed material, which we believe to be highly relevant, primarily as substantive evidence on the issue of whether Clark consented to the sexual activity the night of July 3, 2000.[5] The State argues otherwise in its brief to this court; inferring Clark’s consent from these past incidents is
the very inference that rape-shield laws are meant to avoid; that somehow consent to unrelated sexual activity is relevant to whether the victim consented to the charged offense. Like evidence of a defendant’s prior criminal acts, governed by MRE and FRE 404(b), propensity evidence carries a significant danger of unfair inference and prejudice.
The State is correct that evidentiary rules generally disfavor showing a person’s propensity for certain actions by introducing evidence of past similar acts, and it is further correct that in rape cases evidence regarding “unrelated sexual activity” is generally accepted as only minimally relevant to the question of consent. But rape shield laws, including Michigan’s, almost universally except from this rule evidence regarding prior sexual activity between the complainant and the defendant, precisely because that evidence carries heightened relevancy due to its increased similarity to the instance of the alleged rape. See Mich. Comp. Laws § 750.520j(l)(a); see also Fed.R.Evid. 412(b)(1)(B). In this case, these prior incidents have significant relevance not only because Gagne and Clark were involved in them, but also because they are both remarkably similar to the events that occurred the night of July 3.
*287 Nor do we agree with the State that the excluded evidence was cumulative to the testimony already introduced regarding the Tony’s Lounge incident. There are, of course, similarities between this evidence and the excluded evidence: if Swathwood’s version of the Tony’s Lounge incident is believed, then it demonstrates that Clark had, on at least one occasion, engaged in sexual activities of some variety with multiple partners over the course of one night; it also shows that she did so with Gagne and Swathwood. But we find the differences, which the prosecution took pains to highlight in closing argument, to be more significant. First, the evidence that Clark engaged in group sex during the Tony’s Lounge incident is at best equivocal because Clark testified that she did not remember engaging in any sexual activities with Swathwood that night. She further testified that Gagne later told her that he had made up that part of the story. And although Swathwood testified that this had, in fact, occurred, it would have been obvious to the jury that he had reason to lie about this incident in order to show that Clark had engaged in these similar activities in the past. The prosecution realized that the jury might not believe Swathwood and argued in closing that Clark had not engaged in oral sex with Swathwood during the Tony’s Lounge incident.
Second, even if the jury did believe that Clark and Swathwood had engaged in some sexual activity that night, there is no evidence at all that Clark engaged in that activity with multiple partners at once. At most the evidence shows only that, at some point during that night, she engaged in sexual intercourse with Gagne, and, at another point during the night, she engaged in oral sex with Swathwood, and did so in the presence of other people. This kind of activity differs substantially from the activity that occurred the night of July 3, in which three people engaged in simultaneous group sex. The prosecution, in discussing the Tony’s Lounge incident, pointed out this difference to the jury in closing: “Even if you believe, contrary to ... what Ms. Clark told you, that she did engage in consen[s]ual sexual contact with Mr. Swathwood, the nature of the contact and relations here were 190 degrees [sic] different. That situation did not involve, ladies and gentlemen, two men.”
Finally, even if the excluded evidence merely points to the same predilections shown by the Tony’s Lounge incident, the entire trial hinged upon consent, so the weight of the evidence on this question is extremely important. This is evident from the closing arguments, in which the prosecutor repeatedly stressed the unlikeliness of Gagne’s story, and told the jury that his story was “much more consistent with the pornographic movie than real life.” The defense’s theory was that Clark consented to the activities of July 3, but it had only the Tony’s Lounge incident as evidence that she may have done so. In our view, the exclusion of the evidence of the group sexual activity with Bermudez and the invitation to Gagne’s father were indispensable to the jury’s ability to assess the likelihood of this theory.
We cannot accurately portray the extent of Gagne’s interest in presenting this evidence without reference to the lack of other evidence in this case. Other than the two defendants and the complainant, there were no eyewitnesses at all.[6] Nor did the physical evidence tend weigh in favor of one side or the other. In short, the excluded evidence was not just rele *288 vant to this case, it was in all likelihood the most relevant evidence regarding the sole contested issue at trial- — -an issue about which there was not much evidence in the first place. We believe it was indispensable to the defense’s theory, a conclusion amply demonstrated by the consistent focus during closing arguments on what little evidence the court did admit regarding the likelihood (or unlikelihood) that Clark would have consented to the activity the night of July 3, 2000.
With this in mind, we turn to the Michigan Supreme Court for an indication of the State’s interests in enforcing the rape shield statute. As the court of appeals recognized, the Michigan Supreme Court has explained that those interests are twofold: to encourage victims to report criminal activity and testify at trial; and to further the truth-finding process by preventing the admission of minimally relevant evidence that creates a significant risk of prejudice or confusion. See Adair, 550 N.W.2d at 509. We have acknowledged that there is always a real risk that allowing evidence concerning a complainant’s sexual history will turn the case into a trial of the victim instead of the defendant. Lewis v. Wilkinson, 307 F.3d 413, 422 (6th Cir.2002).
Nonetheless, we do not believe that admitting the evidence at issue in this case would overly frustrate the legitimate purposes of the rape shield statute. After all, the statute itself contains exceptions that demonstrate that the interests it usually serves must also accommodate the defendant’s interest in the admission of evidence that is highly relevant, such as prior sexual conduct between the complainant and the defendant. While we are not reviewing the manner in which the Michigan courts applied the rape shield statute, which is a matter of state law, the fact that it contains this exception illustrates that the Michigan legislature recognized that the defendant has a heightened claim to the introduction of evidence of previous sexual contact with his accuser. This is not a case involving sex a decade before the subject incident. And what made the evidence even more central to petitioner’s defense was the extraordinary nature of the events giving rise to the charge. The idea that someone could have consented to this sort of thing seems incredible absent proof that the person had consented to it before. Therein lies another similarity to Crane. In the underlying trial in Crane and in this case, the evidence that was admitted gave rise to a “question every rational juror needs answered[.]” 469 U.S. at 689, 105 S.Ct. 1005. In Crane, that question was, “[i]f the defendant is innocent, why did he previously admit his guilt?” Id. Here the question jurors would need to have answered if Gagne was to be acquitted was, “how is it possible for anyone to consent to three-way sex of the kind described here?” In each case the exclusion of evidence “effectively disabled” the defendant from answering the question. Id. Moreover, in this case, the excluded evidence would not have been unfairly pi-ejudieial given the sexually graphic testimony that had already been admitted as well as the testimony involving the use of crack cocaine and other narcotics. And as we pointed out in Lewis, “the court could minimize any danger of undue prejudice by admitting the evidence with a cautionary instruction and strictly limiting the scope of cross-examination.” Id.
Finally, we stress that our holding is fact-bound in the extreme: under the circumstances present here, the exclusion of evidence of the complainant’s consensual three-way sex with the defendant only a month before the subject incident, in a three-way rape case in which extensive evidence of the victim’s sexual conduct had already been admitted at trial, and where
*289 the question of guilt or innocence turned almost entirely on the credibility of the victim’s testimony regarding consent, was an unreasonable application of the principles set forth by the Supreme Court in Crane. That case made clear that a defendant’s constitutional right to present a defense, arising from the Due Process Clause of the Fourteenth Amendment, entails the right to put before the jury evidence which is highly relevant, non-cumulative, and indispensable to the central dispute in a criminal trial. This conclusion is also consistent with Lucas, a ease in which the Court recognized that the Michigan rape shield statute implicates the Sixth Amendment rights of the accused and therefore its application must be carefully balanced against the legitimate interests served by the statute on a case by case basis. Lucas, 500 U.S. at 149, 111 S.Ct. 1743. Reliance upon those legitimate interests in this case to exclude the incidents at issue runs contrary to the statute’s exception that would allow a defendant — in this case petitioner — to present evidence of the victim’s past sexual conduct with the actor. Mich. Comp. Laws § 750.520j. While the trial judge may exclude such evidence if its inflammatory or prejudicial nature outweighs its probative value, that discretion cannot trump the constitutional right of the accused to present evidence that is so “highly relevant” that its introduction, as in this case, is “indispensable” to the defense. Crane, 476 U.S. at 691, 106 S.Ct. 2142. For these reasons, we hold that the Michigan Court of Appeals opinion constitutes an “unreasonable application of[ ] clearly established Federal law,” 28 U.S.C. § 2254(d)(1), that deprived petitioner of his constitutional right to “a meaningful opportunity to present a complete defense” as articulated by the Supreme Court in Crane. The writ shall issue.
y.
The judgment of the district court is affirmed.

. That statute provides as follows:
Sec. 520b. (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and ...
*280 if) The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration. Mich. Comp. Laws § 750.520b(l)(f).

. The substantive portion of that law provides:
Sec. 520j(l) Evidence of specific instances of the victim’s sexual conduct, opinion evidence of the victim’s sexual conduct, and reputation evidence of the victim’s sexual conduct shall not be admitted under sections 520b to 520g unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
(a) Evidence of the victim's past sexual conduct with the actor.
Mich. Comp. Laws § 750.520j(l)(a).

. At this point Gagne and Swathwood’s legal proceedings parted ways. Swathwood missed the deadline to apply for leave to appeal in the Michigan Supreme Court, so his application was denied. See Swathwood v. Lafler, No. 04-CV-72251, 2009 WL 322041, at *3 (E.D.Mich. Feb, 10, 2009). He also filed a habeas petition, but the court denied relief because his claims were procedurally defaulted due to his missing the deadline in the Michigan Supreme Court. Id. at *8.

. The parties do not argue that the Michigan courts violated AEDPA by basing their decision “on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d)(2).

. It may also have impeachment purposes, but in our view, this purpose is less relevant than the substantive role this evidence would play, so we focus our analysis on the latter.

. Stout was present for at least some of the activity, but he testified that he was so intoxicated that he remembers nothing, a claim that is in line with Gagne, Swathwood, and Clark's accounts of Stout's general state of intoxication that night.